UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

EDWARD R. DUMBRIQUE,

    Plaintiff,

    v.

NANCY ADAM, MATTHEW CATE, PAULA CRINKLAW, KAVINTIDA CROSS, WILLIAM FAIR, FRANCISCO JACQUEZ, CLARK KELSO, THOMAS MARTINELLI, STEVE NAKAMURA, M. NIMROD, SUE RISENHOOVER, and MICHAEL SAYRE,

    Defendants.

No. C 10-1197 PJH (PR)

**ORDER PARTIALLY GRANTING AND PARTIALLY DENYING MOTIONS FOR SUMMARY JUDGMENT; STAY AND REFERRAL TO MEDIATION**

This is a civil rights case filed pro se by a state prisoner. It was recently reassigned to the undersigned. Defendants Nakamura, Fair, Cross, Adam, Risenhoover, Crinklaw, Sayre, and Jacquez have filed a motion for summary judgment, and defendant Martinelli has filed a separate motion. Plaintiff has opposed the motions and defendants have replied. For the reasons set out below, the motion for summary judgment by Nakamura, Fair, Cross, Adam, Risenhoover, Crinklaw, Sayre, and Jacquez will be granted in part and denied in part, and Martinelli's motion will be granted.

Plaintiff also has filed a motion to limit the summary judgment ruling to the issue of qualified immunity and a motion for the court to declare its dismissal of his state-law claims to have been without prejudice. They are unopposed. Both will be granted.

**BACKGROUND**

The court dismissed the complaint in its initial review order, granting plaintiff leave to amend to plead compliance with the notice requirements of the California Tort Claims Act.

The court also dismissed the claims against defendants in supervisory positions, Sayre, Jacquez, Cate, Nimrod, and Kelso, because plaintiff had failed to plead facts regarding their involvement in the purported deprivation of his constitutional rights. Plaintiff filed an amended complaint. Reviewing it, the court noted that plaintiff had not included any claim against defendant Nimrod, who therefore was dismissed from the case. Plaintiff also failed to adequately plead compliance with the tort claims act, so his state law claim was dismissed. His supervisory liability allegations regarding Cate and Kelso were found to be insufficient and they were dismissed from the case. The court ordered service on the remaining defendants, including supervisors Sayre and Jacquez. The defendants remaining in the case therefore are Nakamura, Fair, Cross, Adam, Martinelli, Risenhoover, Crinklaw, Sayre, and Jacquez.

**DISCUSSION**

**I.  Motions**

In an order entered on September 20, 2011, the court granted defendants' motions to stay discovery pending disposition of the threshold issue of qualified immunity. Plaintiff asks that the court therefore limit its ruling on the motions for summary judgment to the qualified immunity ground, given that he has been limited in his discovery as to the merits. The motion is unopposed. It will be granted.

Plaintiff's motion that the court clarify that its dismissal of his state law claims was without prejudice also will be granted.

Defendants' motion to strike excess pages from plaintiff's opposition to the dispositive motion will be denied in view of plaintiff's pro se status.

**II.  Claims for Injunctive and Declaratory Relief**

Plaintiff asks for injunctive and declaratory relief as well as damages. Individual suits for injunctive and declaratory relief from alleged unconstitutional prison conditions cannot be brought where there is a pending class action suit involving the same subject matter. *McNeil v. Guthrie*, 945 F.2d 1163, 1165 (10th Cir. 1991); *Gillespie v. Crawford*, 858 F.2d 1101, 1103 (5th Cir. 1988) (en banc). "Individual members of the class and other

prisoners may assert any equitable or declaratory claims they have, but they must do so by urging further actions through the class representative and attorney, including contempt proceedings, or by intervention in the class action." *Id.* Here, the class action *Plata v. Schwarzenegger*, No. C 01-01351 TEH (N.D. Cal.), involves the same subject matter and is pending. Plaintiff's claims for injunctive and declaratory relief therefore will be dismissed.

**III.    Motions for Summary Judgment**

    **A.    Standard of Review**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). When the moving party has met this burden of production, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. If the nonmoving party fails to produce enough evidence to show a genuine issue of material fact, the moving party wins. *Id.*

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The rule of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law"; defendants can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. *Malley v. Briggs*, 475 U.S. 335, 342 (1986). "Therefore,

regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). Qualified immunity is particularly amenable to summary judgment adjudication. *Martin v. City of Oceanside*, 360 F.3d 1078, 1081 (9th Cir. 2004).

A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan*, 555 U.S. 225, 235-36 (2009) (overruling the sequence of the two-part test that required determination of a deprivation first and then whether such right was clearly established, as required by *Saucier v. Katz*, 533 U.S. 194 (2001). The court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. *Id.* (noting that while the *Saucier* sequence is often appropriate and beneficial, it is no longer mandatory).

Regarding the first prong, the threshold question must be: Taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? *Saucier*, 533 U.S. at 201; *see Martin*, 360 F.3d at 1082 (in performing the initial inquiry, court is obligated to accept plaintiff's facts as alleged, but not necessarily his application of law to the facts; the issue is not whether a claim is stated for a violation of plaintiff's constitutional rights, but rather whether the defendants *actually* violated a constitutional right) (emphasis in original); *see, e.g., Martin*, 360 F.3d at 1081-84 (defendant police officers entitled to qualified immunity where, under facts alleged by plaintiff, "emergency aid" exception to Fourth Amendment warrant requirement was applicable and officers had complied with prevailing case law requirements when entering residence; defendant police officers entitled to qualified immunity where plaintiff admittedly and deliberately ignored knocks at door, making "a violation of the Fourth Amendment's knock and announce rule [] utterly incomprehensible."). "If no constitutional right would

have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

The inquiry of whether a constitutional right was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition. *Saucier*, 533 U.S. at 202. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.*; *see*, *e.g.*, *Pearson*, 555 U.S. at 243-44 (concluding that officers were entitled to qualified immunity because their conduct was not clearly established as unconstitutional as the "consent-once-removed" doctrine, upon which the officers relied, had been generally accepted by the lower courts even though not yet ruled upon by their own federal circuit). If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *Saucier*, 533 U.S. at 202.

**B.     Motions for Summary Judgment**

Plaintiff's remaining claims are (1) that defendants Nakamura, Fair, Cross, Adam, Risenhoover, Crinklaw, Sayre, and Jacquez were deliberately indifferent to his serious medical need in failing to provide proper care for his hernia after his transfer to Pelican Bay; and (2) that defendants Adam and Martinelli were deliberately indifferent in failing to supply sufficient pain medication after the surgery.

**1.     Standard**

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *Id.* at 1059.

A "serious" medical need exists if the failure to treat a prisoner's condition could

result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment. *Id.* at 1059-60.

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

**2. Facts**

The following facts are undisputed except where indicated otherwise.

Plaintiff suffered a left inguinal hernia while he was housed at Corcoran State Prison. Decl. Dumbrique at ¶ ¶ 15-17. CSP medical officials had recommended and approved surgery for his condition when plaintiff became eligible for transfer to Pelican Bay. *Id.* at ¶ ¶ 17, 22-23. Plaintiff opted for the transfer, and was transferred to Pelican Bay on April 1, 2009. *Id.* at ¶ 23. The day after his transfer, April 2, 2009, he filed a request for health care service, complaining about his hernia. *Id.* at ¶ 24. He was seen the next day by a nurse who told him to refrain from exercising and to go to sick call if the hernia worsened. Decl. Sayre at ¶ 8.

On May 8, 2009, defendant Crinklaw, a Certified Family Nurse Practitioner, saw plaintiff. Decl. Sayre at ¶ 9; Decl. Dumbrique at ¶ 27. She noted that the hernia could be reduced, "but would reemerge shortly after reduction." Id. Crinklaw stated in her medical notes that plaintiff denied any pain and had no "gastrointestinal issues." *Id.* She referred the need for hernia repair to the Utilization Management Committee, and noted to followup

in thirty days. *Id.*, Ex. A at OAG-016, OAG-021, OAG-024.

Crinklaw noted that plaintiff told her that he "does 1000 pushups a day, 200 burpees a day, no jumping jacks . . . ." *Id.* at OAG-017. Plaintiff contests that he told her any such thing, saying that her entry "is completely false and I believe Defendant Crinklaw created this statement to give the MAR committee at PBSP a reason to deny the medically necessary surgery." Decl. Dumbrique at ¶ 27. He also told her that the hernia caused him daily pain and limited his daily activities. *Id.* at ¶¶ 24, 27. Crinklaw told plaintiff that although she was recommending the surgery, it would not be provided because PBSP policy was to allow surgery for hernias only if they were strangulated. *Id.* at ¶ 29. Crinklaw did not prescribe any pain medication or a truss that might help with the pain. *Id.*

On May 12, 2009, the Utilization Management Nurse "noted Plaintiff's lack of adverse symptoms related to his hernia condition, his ability to engage in activities of daily living, and his strenuous exercise program." Decl. Sayre at ¶ 10. She forwarded the request for review by Sayre, who denied it on May 21, 2009, because the hernia was reducible, plaintiff did not have adverse symptoms, and the hernia was not interfering with his daily activities. *Id.* He also says that CDCR policy allows surgery only for incarcerated hernias, ones which cannot be pushed back inside the abdominal wall, and that plaintiff's hernia was not incarcerated. *Id.* Sayre did not examine plaintiff or interview him. Decl. Dumbrique at ¶ 30.

Plaintiff was seen on June 1, 2009, for an EKG; the records show no complaint about the hernia or pain from it. Decl. Sayre at ¶ 11.

On June 10 he filed a health care request in which he said that the hernia had "recently become very painful . . ." and gotten larger, and that he was unable to push it back into his abdomen. *Id.*, Ex. A at OAG-032. He was seen by defendant Nakamura, a registered nurse. Decl. Dumbrique at ¶ 36. Nakamura recorded that plaintiff said that he had regular bowel movements and that he denied "any problems with his stool." Decl. Sayre, Ex. A at OAG-033. Plaintiff said his pain level at night was 10/10 and was 6/10 at the time of the interview. *Id.* Under "Physical assessment and clinic interview," Nakamura

7

wrote: "Alert and oriented. No s/s of pain or distress. Abdomen soft and nontender. Bowel sounds present 4 Q's and normal. Skin warm and dry. Patient with an egg-sized left inguinal hernia. Hyperactive to palpable pain. Unable to reduce. Patient acts like the pain is too great when attempted." *Id.* Plaintiff says that Nakamura twice tried to reduce the hernia, pressing hard on it for six seconds with both hands the first time, causing severe pain, and three or four seconds the second time, again causing plaintiff to ask him to stop. Decl. Dumbrique at ¶ 36.

Nakamura told plaintiff that he would discuss the case with the "PCP" (primary care physician) and attempt to get him Tylenol, and that "the PCP line was backed up for 6-7 weeks." Decl. Sayre, Ex. A at OAG-34. Plaintiff "[u]nderstood this, and stated that he did not think this could wait that long." *Id.* Nakamura instructed plaintiff "that he should let me know if he starts to not have a bowel movement or if his pain level increases significantly." *Id.* Under "Plan" in the record, Nakamura noted: "Discussed with Dr. Adam. Will place on the PCP line to see if the hernia can be reduced. Patient refused surgery at the prior institution." *Id.* Plaintiff says in his declaration that in addition, Nakamura told him that Nakamura "did not believe the pain and other problems was due to the hernia." Decl. Dumbrique at ¶ 37. He says that when he protested and asked to see a doctor, Nakamura shook his head "no." *Id.*

Plaintiff says in his declaration that Nakamura saw him at his cell shortly thereafter. *Id.* at ¶ 38. Nakamura told plaintiff that he had gotten plaintiff Tylenol and Pepto-Bismol for plaintiff's "stomachache." *Id.* When plaintiff asked Nakamura to call a doctor, Nakamura "accused [him] of 'faking it[,]' called [him] a 'criminal,' and claimed he 'knew how criminals acted always trying to manipulate the system' and that [plaintiff] 'wasn't fooling him.'" *Id.* When plaintiff told Nakamura to do his job and call a doctor, Nakamura told him that he would have to wait "like everybody else." *Id.* When plaintiff insisted he could not wait that long, Nakamura said "whatever" and walked away." *Id.* These contentions are supported by declarations from two other prisoners who were present. Decl. Herrera at ¶ 3, Decl. Rodriquez at ¶ ¶ 2-4.

8

Plaintiff says in his declaration that he repeated his requests to see a doctor to Nakamura on June 11 and 12, and was told "no." Decl. Dumbrique at ¶ ¶ 42-43. He says that the hernia continued to be very painful. *Id.* He says that there was no change on the 13th, but does not allege that he saw Nakamura or any other medical provider that day. *Id* at ¶ 43.

On the morning of June 14, 2009, plaintiff was brought to the clinic in a wheelchair suffering from intense hernia pain that he said "exploded" at 4 am. *Id.* at OAG-040. He was taken to Sutter Coast Hospital by ambulance. Decl. Sayre at ¶ 13. The hospital's physicians were able to reduce the hernia. *Id.* at ¶ 14. They instructed him to reduce the hernia as soon as it reoccurred, and to avoid exercises that might increase abdominal pressure. *Id.* He was returned to Pelican Bay around noon the same day. *Id.* at ¶ 15. The medical records note that he showed no signs of discomfort and that he stated he had no pain. *Id.* at Ex. A, OAG-046. He was prescribed laxatives and stool softener, and told to seek assistance if symptoms reoccurred. *Id.*

At 8:30 pm on June 14 he told defendant Cross that he felt better, and the nurse recorded that he showed no signs of discomfort. *Id.*

Plaintiff says in his declaration that at about 9:00 pm on the 14th his hernia became "severely painful." Decl. Dumbrique at ¶ 49. He asked for medical help. *Id.* He says that he was seen by defendants Fair and Cross, nurses. *Id.* He told them the history of his case and that he was unable to defecate. *Id.* Fair told him that he "just had to be a man about it" and that "there was nothing they could do." *Id.* They also gave him a laxative "that apparently Defendant Cross omitted to give me earlier." *Id.* Plaintiff says that contrary to the medical records, Cross did not take his vital signs. *Id.* at ¶ 50.

The medical records show that Fair contacted defendant Risenhoover, who ordered pain medication for him. Decl. Sayre, Ex. A at OAG-49. Plaintiff says he did not receive it. Decl. Dumbrique at ¶ 51-52.

At 12:30 pm on June 15, 2009, defendant Martinelli, a physician, saw plaintiff and diagnosed an incarcerated hernia. *Id.* at OAG-052. He was transferred to Sutter Coast for

9

possible surgery. Decl. Sayre at ¶ 18. Plaintiff's hernia was surgically repaired at the hospital and he was held there overnight, then returned to Pelican Bay. *Id.* at ¶ 19-20.

Plaintiff was returned to Pelican Bay on June 16, 2009, at about 1:00 pm. Decl. Sayre at ¶ 21. The hospital release notes prescribe a narcotic pain reliever called "Norco." *Id.* at ¶ 22 (nature of Norco); Decl. Dumbrique at ¶ 57. Plaintiff was seen by defendant Martinelli upon his return to Pelican Bay. Decl. Sayre at ¶ 21. Dr. Martinelli changed the pain relief prescription to Tylenol #3 with codeine for five days, and a stool softener. *Id.* Plaintiff was given two pills at 1:50 pm on the 16th. *Id.* He was given two more at 8:00 pm that night. *Id.* Dr. Martinelli had no further contact with plaintiff. Decl. Martinelli at ¶ 6.

Dr. Sayre says in his declaration that Norco is "a powerful opiate-based narcotic" with a high "potential for abuse and deleterious effects among the prison population . . . ." *Id.* at ¶ 22. Tylenol #3 contains codeine, an opiate. *Id.* He notes, as does Dr. Adam, that Tylenol #3 was prescribed at the hospital to treat his pain while there. *Id.*; Decl. Adam at ¶ 7.

On June 17, 2009, at about 7:00 am, plaintiff received another dose of pain medication, apparently from defendant Nakamura. Decl. Dumbrique at ¶ 63. At around 9:00 am he was seen by Nakamura again, evidently in response to his complaints about pain. *Id.* at ¶ 64; Decl. Sayre at ¶ 23. Nakamura contacted Dr. Adam, who authorized giving the Tylenol #3 four times a day rather than the previous three times, authorized adding Tylenol 650 mg for "breakthrough pain," and authorized giving more Tylenol #3 immediately, although plaintiff had already received some that morning. Decl. Sayre at ¶ 23; Decl. Adam at ¶ 10.

Later on June 17, plaintiff submitted a health care request form in which he said he was suffering severe pain when he sneezed, asked for more pain medication, and asked to be admitted to the infirmary. Decl. Sayre at ¶ 24. He was seen by nurse Fair, who told him that he did not meet the criteria for admission to the infirmary and to take his pain medication before the pain became too severe. *Id.*

On June 18, plaintiff submitted another request for health service form asking for

better pain management and saying that he had not received his 3:30 am dose of Tylenol #3. *Id.* at 26. In the request he did not name the nurse responsible for the purported missed dose of painkiller, and does not contend here that it was a defendant. See *id.* at Ex. A, OAG-081. He was seen by Nakamura that day and informed that Dr. Adams would see him later in the day. *Id.* at ¶ 27. Dr. Adam saw him and discussed pain management with him. *Id.*

### 3. Analysis

In both summary judgment motions, the movants contend that they were not deliberately indifferent. A prison official is deliberately indifferent if the official knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. 825 at 837. Because the only issue before the court is qualified immunity, the question as to each movant is whether on the undisputed facts, or if disputed, plaintiff's version, it would have been clear to a reasonable person in the circumstances that there was a substantial risk of serious harm and that disregarding the risk was unlawful. *See Saucier*, 533 U.S. at 202.

"If there are genuine issues of material fact in issue relating to the historical facts of what the official knew or what he did, it is clear that these are questions of fact for the jury to determine." *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1099 (9th Cir. 1995). If the essential facts are undisputed, or no reasonable juror could find otherwise, however, then the question of qualified immunity is appropriately one for the court. *Id.* at 1100 (citing *Hunter v. Bryant*, 502 U.S. 224, 227-28 (1991)). Or the court may grant qualified immunity by viewing all of the facts most favorably to plaintiff and then finding that under those facts the defendants could reasonably believe they were not violating the law. *See, e.g., Marquez v. Gutierrez*, 322 F.3d 689, 692-93 (9th Cir. 2003); *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1051-53 (9th Cir. 2002).

Plaintiff contends that defendant Jacquez, the warden, is liable because he is in charge of the prison and failed to ensure that there were enough doctors available, but has failed to allege any facts regarding Jacquez's role in medical staffing, and plaintiff's

11

allegations regarding his care, set out above, do not involve inadequate staffing. On this record Pelican Bay had a policy of not doing surgical hernia repairs except for strangulated hernias, and there is no evidence that the policy was the result of a doctor shortage, or that Jacquez was responsible for it. The motion for summary judgment by Jacquez will be granted.

Defendant Martinelli's liability is premised on his having prescribed Tylenol #3 after surgery. Given the evidence as to the relative efficacy of Norco and Tylenol #3, a reasonable person in his situation would not perceive that prescription to be unlawful conduct. His motion will be granted.

Defendant Adam is a physician who was consulted by Nakamura on June 10 and who approved his putting plaintiff on the schedule to see a primary care physician. A reasonable person in her situation would not perceive her approval to be unlawful conduct. Adam also approved the use of Tylenol #3 for pain relief after surgery. As noted above, a reasonable person in Dr. Adam's situation would not perceive doing so to be unlawful conduct. Her motion will be granted.

Defendant Risenhoover is a Family Nurse Practitioner who was contacted by Fair on June 14 and who ordered pain medication for him. Plaintiff contends he did not receive the medication, but does not link this failure to Risenhoover. He also contends that she failed to see that he was returned to the hospital for treatment of what he asserts was, at that point, an incarcerated hernia, but there are no facts showing that it was incarcerated at that point or that Risenhoover had any reason to think that it was. A reasonable person in her situation would not perceive her approval to be unlawful conduct. Her motion will be granted.

Defendant Crinklaw was the Certified Family Nurse Practitioner who saw plaintiff on May 8, 2009. She referred the hernia repair issue to the Utilization Management Committee, but in her notes claimed that plaintiff had no pain and that the hernia did not limit his daily activities, and that he was engaging in a strenuous exercise program. Plaintiff contends that he did not tell her any of these things, and that her false notes caused the

committee to deny surgery. There thus is a genuine dispute of fact on this point, and because viewing all of the facts most favorably to plaintiff, Crinklaw could not have reasonably believed she was not violating the law, her motion for summary judgment on qualified immunity grounds must be denied.

Defendant Cross was one of the nurses who saw plaintiff on June 14. Plaintiff's allegations that Cross "apparently" failed to give him a laxative and lied on the medical record about taking his vital signs are not actions that a reasonable person in Cross' position would believe to be deliberate indifference to a serious medical need. Her motion for summary judgment on qualified immunity grounds will be granted.

Defendant Fair was the other nurse who saw plaintiff on June 14. Plaintiff told Fair and Cross that his hernia was "severely painful." Fair told him that he "just had to be a man about it" and that "there was nothing they could do," but also contacted Risenhoover, who ordered pain medication for plaintiff. Plaintiff says he did not receive it, but does not link this to Fair. A reasonable person in Fair's situation would not perceive his actions to be unlawful conduct. His motion for summary judgment on qualified immunity grounds will be granted.

Defendant Nakamura refused to call a doctor several times when plaintiff claimed his pain was intense, and "accused [him] of 'faking it[,]' called [him] a 'criminal,' and claimed he 'knew how criminals acted always trying to manipulate the system' and that [plaintiff] 'wasn't fooling him.'" Because Nakamura could not have reasonably believed he was not violating the law, his motion for summary judgment on qualified immunity grounds must be denied.

Defendant Sayre was responsible for a policy of surgically repairing hernias only when they were incarcerated, and refused Crinklaw's request for a surgical repair for plaintiff when the request appeared to establish a serious medical need. His motion for summary judgment will be denied.

## CONCLUSION

1. Plaintiff's claims for injunctive and declaratory relief are **DISMISSED** in light of the

13

pending class action case, *Plata v. Schwarzenegger*, involving the same subject matter.

2. Plaintiff's motions to limit the issues on summary judgment to qualified immunity (document number 146 on the docket) and to clarify that the court's earlier dismissal of his state law claims was without prejudice (document 148) are **GRANTED**. The dismissal of the state law claims was without prejudice.

3. Defendants' motion to strike (document 145) is **DENIED**.

4. The motion for summary judgment filed by defendants Nakamura, Fair, Cross, Adam, Risenhoover, Crinklaw, Sayre, and Jacquez (document number 94 on the docket) is **GRANTED** in part and **DENIED** in part. It is granted as to plaintiff's damages claims against Jacquez, Adam, Risenhoover, Cross, and Fair. It is denied as to his damages claims against Nakamura, Crinklaw, and Sayre.

5. Martinelli's motion for summary judgment (document number 108) is **GRANTED**.

6. This case is referred to Magistrate Judge Nandor Vadas pursuant to the Pro Se Prisoner Mediation Program. Judge Vadas shall conduct mediation proceedings and file a report thereafter. The proceedings are confidential and no statement made therein will be admissible in any proceedings in the case, unless the parties otherwise agree. In view of the referral, further proceedings in this case are **STAYED**.

If the case is not settled, the court will enter a new scheduling order for further proceedings. The clerk shall mail a copy of this order to Magistrate Judge Vadas in Eureka, California.

**IT IS SO ORDERED.**

Dated: March 26, 2012.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\CR.10\DUMBRIQUE1197.MSJ.wpd